NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
# DISTRICT OF THE VIRGIN ISLANDS
# DIVISION OF ST. THOMAS AND ST. JOHN

| | |
|---|---|
| WILNICK DORVAL, | |
| Plaintiff, | Civ. No. 16-61 |
| v. | **OPINION** |
| MOE'S FRESH MARKET, WALLIE HAMED, and DEMAH, INC. d/b/a Moe's Fresh Market, | |
| Defendants. | |

THOMPSON, U.S.D.J.[1]

## INTRODUCTION

This matter comes before the Court upon the Second Amended Complaint filed by Plaintiff Wilnick Dorval ("Plaintiff") alleging that he was subject to discrimination by Defendants Demah, Inc., doing business as Moe's Fresh Market,[2] and Wallie Hamed (collectively, "Defendants"). (ECF No. 286.) The parties proceeded to trial to determine whether Defendants violated 42 U.S.C. § 1981 (Counts 1 and 2 (*id.* ¶¶ 5.1–5.2)) and intentionally inflicted emotional distress (Counts 3 and 4 (*id.* ¶¶ 5.3–5.4)). The Court conducted a non-jury trial on November 5, 2018, and considered all evidence presented. Pursuant to Rule 52(a)(1) of the Federal Rules of Civil Procedure, the Court issues the following Findings of Fact and

---

[1] The Honorable Anne E. Thompson, United States District Judge for the District of New Jersey, sitting by designation.

[2] Moe's Fresh Market was originally listed as a Defendant (Am. Compl. at 1, ECF No. 4.) However, as explained at trial, Moe's Fresh Market is not a legal entity capable of being sued but merely the trade name of Demah, Inc. The operant complaint names Demah, Inc. d/b/a Moe's Fresh Market as a Defendant. The Court therefore no longer considers Moe's Fresh Market to be a defendant in its own right.

1

Conclusions of Law.

## FINDINGS OF FACT

Plaintiff is a black, Haitian man. He is a lawyer by training who moved from New York several years ago. He lives in Sapphire Village Condominiums in Red Hook, St. Thomas. Until April 2016, Plaintiff regularly shopped for groceries at Moe's Fresh Market in Red Hook, St. Thomas ("Moe's").

This case arises from a dispute about how Plaintiff was treated as a customer at Moe's. Plaintiff testified that during his trips to the store, employees and customers harassed him in various ways because he is black and Haitian. Specifically, he stated that they blocked him from walking through the aisles, ran or walked quickly towards him, lunged towards him, flicked their heads at him, made loud and disturbing noises near him, and recorded him in the store.

Plaintiff presented four videos at trial to prove his allegations. (Ex. Nos. 8, 9, 10, 12.) Each video has been recorded by Plaintiff himself, and shows him walking through Moe's and shopping for groceries. From the videos, Moe's appears to be a large, attractively-stocked grocery store, with a variety of fresh produce and dry goods. The store is clean and apparently well-kept. Each video shows a number of customers picking out items from the shelves and buying those items at a cashier's station. The videos also show employees working at the checkout counter and the deli, stocking shelves, and performing other routine tasks. Unfortunately, Plaintiff's complaints are not supported by the video evidence offered.

In one of these videos, Plaintiff enters Moe's and walks through the aisles of the store. (Ex. No 10.) He takes a small number of items from various aisles, no more than a half dozen in total, and places them in his basket. (*Id.*) Plaintiff sings part of the time while he is walking through the aisles. (*Id.*) At one point a customer temporarily blocks an aisle as he reaches an item

2

on a low shelf. Plaintiff forcefully says, "Can you get the fuck out the way?" and walks past. (*Id.*) Other than this incident, nothing else in this video shows customers or employees blocking Plaintiff from walking through the aisles or taking any other intimidating actions as alleged by Plaintiff. (*Id.*) Plaintiff enters a check-out lane, pays for his groceries, and leaves. (*Id.*)

A second video is much like the first. (Ex. No. 9.) Plaintiff enters the store, walks through several aisles, and places a small number of items in his basket. (*Id.*) At one point Plaintiff walks past a man in a white shirt and dark apron who appears to be an employee. (*Id.*) This man is standing in an aisle but does not impede Plaintiff from walking through the store. (*Id.*) The video also shows a woman in a white shirt and a blue apron. (*Id.*) Like the man, she appears to be an employee and stands in an aisle without blocking Plaintiff. (*Id.*) The video also shows, at different points, two different employees both wearing yellow shirts. (*Id.*) One employee appears to be sweeping, and the other is writing on a clipboard. (*Id.*) Neither employee blocks Plaintiff, runs or walks quickly towards him, flicks his head at him, makes loud or disturbing noises, or records him. (*Id.*) The video also shows several customers at Moe's, but they do not engage with Plaintiff or pay him much attention. (*Id.*) As with the previous video, Plaintiff buys his groceries and leaves without incident. (*Id.*)

A third video similarly shows Plaintiff walking through the aisles, picking up groceries, paying for his items, and leaving the store. (Ex. No. 12.) In this video, an employee is seen stocking shelves but does not attempt to block Plaintiff from walking through the store. (*Id.*) When Plaintiff checks out, the cashier appears to give Plaintiff an uncomfortable and suspicious look. (*Id.*) Based on the testimony of Mohammed Hamed, the Court infers that the cashier's strange look is the result of her seeing that Plaintiff is taking a video recording of her. As with the other videos, this video does not show employees or customers taking any action to harass or

intimidate Plaintiff. (*Id.*)

In a final video, Plaintiff has an altercation with Mohammed Hamed that is described below. (Ex. No. 8.) But neither Mohammed Hamed nor anyone else in the store blocks Plaintiff, runs or walks quickly towards him, flicks his head at him, makes loud or disturbing noises, or records him. (*Id.*)

In several videos there are carts filled with boxes and other items that might partially block a person's movement. None of these appear to constitute intentional activity to prevent Plaintiff from moving through the aisles. In none of the videos does anyone intentionally impede Plaintiff's movement through the store, run or walk quickly towards Plaintiff, lunge towards him, flick their head at him, make loud noises, or record him.

The video evidence shows quotidian trips to a grocery store; it does not show Moe's employees or customers harassing Plaintiff.

In three of the four videos, Plaintiff buys his groceries and leaves without hindrance. (Ex. Nos. 9, 10, 12.) But one video recorded on April 11, 2016 shows that Plaintiff was interrupted from buying groceries. (Ex. No. 8.) In that video, Mohammed Hamed[3] (not to be confused with Defendant Wallie Hamed), a manager at Moe's, is seen speaking to a small group of other customers. (*Id.*) Plaintiff says at some distance, "I want to pay for my stuff" and reiterates this statement while Mohammed Hamed speaks with the other customers. (*Id.*) A few moments later, Mohammed Hamed walks up to Plaintiff and makes several statements that are somewhat muffled on the video. Mohammed Hamed is heard making statements like, "You're not welcome

---

[3] Mohammed Hamed testified that he is the person in the video, but Plaintiff at trial suggested that the person in the video was neither Mohammed Hamed nor Defendant Wallie Hamed. Because Mohammed Hamed admitted to being the person in the video despite the fact that it possibly inculpates him, the Court accepts Mohammed Hamed's testimony that he is the one in the video.

4

here," and, "We have the right to refuse service." Plaintiff then leaves the store while making aggressive statements to Mohammed Hamed, cursing and threatening him. Mohammed Hamed does not respond to this aggressive behavior. It is evident from this incident that Plaintiff was denied the opportunity to buy groceries from Moe's on at least one occasion and was at some point barred from shopping at Moe's.

Moe's was generally open to the public. The videos show that the clientele of the store consists of a large number of black customers as well as many white customers. Mohammed Hamed testified that 60% to 90% of Moe's customers are black. The videos do not show black customers being treated differently from white customers, nor does it show black customers being refused service. In fact, Plaintiff is the only individual denied service in the videos. This evidence suggests that Plaintiff's being barred from shopping at Moe's was not the result of his race.

Plaintiff claims that he suffered discriminatory treatment because of his Haitian ancestry. Mohammed Hamed testified that he was not aware of Plaintiff's Haitian ethnicity. Plaintiff argues that his being Haitian is evident from his accent. Mohammed Hamed testified that Plaintiff did not speak to him until the last incident where Plaintiff was told he was not welcome at Moe's. For these reasons, Plaintiff was likely not excluded from shopping at Moe's as a result of his Haitian ethnicity.

Moe's had a policy that members of the public were not allowed to take photos or video recordings in the store. According to Mohammed Hamed, this policy is in place because of concerns that business competitors might record to gain an advantage over Moe's and that miscreants might make recordings in preparing to rob the store. When individuals other than Plaintiff had recorded in the store, Mohammed Hamed told them to stop.

5

Mohammed Hamed had seen Plaintiff recording in the store approximately four times and had received complaints from both employees and customers about Plaintiff's recording. Each time Mohammed Hamed saw Plaintiff in the store, he told Plaintiff multiple times not to record. In each of these instances up until the last one, Plaintiff walked away without speaking to Mohammed Hamed. In the last of the encounters, recorded on video, Mohammed Hamed told Plaintiff he was not welcome in the store. One can only conclude that Plaintiff was refused service because he repeatedly recorded while in the store and ignored Mohammed Hamed's instructions to stop recording.

## CONCLUSIONS OF LAW

### I.     Counts 1 and 2: 42 U.S.C. § 1981

42 U.S.C. § 1981 ensures "[a]ll persons . . . the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." This statute protects against intentional discrimination on the basis of race. *Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 391 (1982). In this case, Defendant Demah, Inc., through its agent Mohammed Hamed, did refuse service to Plaintiff. However, its refusal of service appeared to be in reaction to Plaintiff's continuous recording in the store, not due to his race or ethnicity. Therefore, there is no evidence that Defendants intended to discriminate against Plaintiff based on his race or ethnicity in violation of § 1981.

### II.    Counts 3 and 4: Intentional Infliction of Emotional Distress

Intentional infliction of emotional distress occurs when an individual "by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another."

Restatement (Second) of Torts § 46(1) (Am. Law Inst. Nov. 2018 update).[4] Extreme and outrageous conduct does not encompass "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Id.* cmt. d. Rather, an intentional infliction of emotional distress claim may be maintained only "where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.*

Here, Defendants did not engage in any conduct constituting extreme and outrageous conduct. Even if the actions alleged—blocking Plaintiff, running and lunging at him, making loud and disturbing noises towards him—were considered extreme and outrageous, the weight of the evidence shows that Defendants did not engage in these behaviors. Defendants therefore did not intentionally inflict emotional distress on Plaintiff.

## CONCLUSION

For the foregoing reasons, judgment will be granted on behalf of Defendants on all Counts. An appropriate order of judgment will follow, consistent with Rule 58 of the Federal Rules of Civil Procedure.

Date: 11/30/18

ANNE E. THOMPSON, U.S.D.J.

---

[4] The Virgin Islands applies the Restatement approach to this tort. *Eddy v. V.I. Water & Power Auth.*, 369 F.3d 227, 231 (3d Cir. 2004); *Stevens v. Louise*, 2016 WL 9454137, at *3 (V.I. Super. Ct. June 13, 2016).

7